**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NIKEA BYERS, GABRIELLE WINANS, KENNETH SMITH, TANISHA MADISON, and WANDA SINKLER, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SUNRISE SENIOR LIVING, LLC, THE 401(K) PLAN FIDUCIARY COMMITTEE OF SUNRISE SENIOR LIVING, LLC, and JOHN DOES 1-10, <br><br> Defendants. | CIVIL ACTION NO.: |

**CLASS ACTION COMPLAINT**

Plaintiffs Nikea Byers, Gabrielle Winans, Kenneth Smith, Tanisha Madison, and Wanda Sinkler ("Plaintiffs"), by and through their attorneys, on behalf of the Sunrise Senior Living 401(k) Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Sunrise Senior Living, LLC ("Sunrise" or the "Company"), and the 401(k) Plan Fiduciary Committee of Sunrise Senior Living, LLC and its members during the

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

Class Period (the "Committee") (collectively, the Company and the Committee are referred to as "Defendants").

2.      The Plan is a defined contribution plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. *See* Independent Auditors' Report ("Auditors' Report"), attached to 2024 Form 5500 for the Plan, at 7 ("The Plan is a defined contribution plan, pursuant to the provisions of Section 401(k) of the Internal Revenue Code (the "IRC"). The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended.").

3.      To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 333 (3d Cir. 2019).

4.      The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees,* (Sept. 2019), at 2[2]; *see also Tibble v. Edison Int'l,*

---

[2] Available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited January 13, 2026).

135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5.    Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.

6.    "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

7.    The Supreme Court reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. *Hughes v. Nw. Univ.*, 595 U.S. 170, 175, 142 S. Ct. 737, 741, 211 L. Ed. 2d 558 (2022).

8.    Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties it owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to objectively and adequately review the Plan's investment portfolio, initially and on an

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

9.    At all times during the Class Period, the Plan had about three hundred thousand dollars in assets under management. At the Plan's fiscal year end in 2020, the Plan had $298,880,271 in assets under management that were/are entrusted to the care of the Plan's fiduciaries. *See* 2020 Form 5500 for the Plan, Schedule H, at 2.

10.    By 2024, the Plan had $360,105,590 in assets under management. *See* 2024 Form 5500 for the Plan, Schedule H, at 2.

11.    The Plan is also large in terms of the number of its participants. At the beginning of the Class Period, the Plan had 22,188 participants. *See* 2020 Form 5500 for the Plan, at 2. By 2024, the Plan had 23,402 participants. *See* 2024 Form 5500 for the Plan, at 2.

12.    With regard to the Plan's investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a guaranteed investment contract ("GIC") in the Plan with lower crediting rates compared to available, similar investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

13.    Specifically, Defendants allowed substantial assets in the Plan to be invested in a Guaranteed Income Fund ("Prudential[4] GIF"), a benefit-investment contract. The Prudential GIF provided a significantly lower rate of return than other comparable investments that Defendants could have made available to Plan participants.

---

[4] "The Plan has an Evergreen Group Annuity Contract with Empower [Annuity Insurance Company] for the Guaranteed Income Fund as of December 31, 2022 and for the period April 1, 2022 through December 31, 2022 and Prudential [Retirement Insurance and Annuity Company] as of December 31, 2021 and for the period of January 1, 2022 through March 31, 2022." Auditors' Report, attached to 2022 Form 5500 for the Plan, at 12.

14.    A prudent fiduciary would not have included this underperforming investment option that also carried significantly more risk than other investment options that had similar goals, *i.e.,* preservation of investment assets.

15.    Prudential/Empower benefited significantly from Plan participants being invested in the Prudential GIF. A prudent fiduciary who adequately monitored the Plan's investments and placed the interests of participants in the Plan above all would have recognized that the Prudential GIF was benefiting Prudential/Empower at the expense of the participants in the Plan. The investments in the Prudential GIF were held and invested by Prudential/Empower, which kept the spread (the difference between the amount it earned on the investment and the amount it paid to the Plan's participants). The crediting rates that Prudential/Empower provided to the Plan were and are so low that Prudential/Empower reaped a windfall on the spread.

16.    Plaintiffs also allege that the Defendants engaged in prohibited transactions with a party-in-interest. Specifically, Defendants breached their fiduciary duties of prudence by allowing a party-in-interest, Prudential/Empower,[5] to benefit from its provision of services to the Plan by receiving excessive compensation for managing the Prudential GIF.

17.    The arrangements and transactions with Prudential/Empower are prohibited transactions because they "amount[] to a 'direct or indirect ... furnishing of services ... between the plan and a party in interest,' 29 U.S.C. § 1106(a)(1)(C)." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009).

---

[5] "Certain of the Plan's investments are managed by affiliates of the trustees [Prudential prior to April 1, 2022 and Empower on April 1, 2022 and continuing thereafter], and therefore, these transactions qualify as party-in-interest transactions. Fees incurred by the Plan for the investment manager services are included in net depreciation in the fair value of investments, as they are paid through revenue sharing, rather than a direct payment." Auditors' Report, attached to 2022 Form 5500 for the Plan, at 13; *see also id*., at 7 ("Effective April 1, 2022, Empower acquired the full-service retirement business of Prudential.").

18.     Plaintiffs also allege that the Defendants engaged in prohibited transactions with Prudential/Empower, a party-in-interest, under which Prudential/Empower received millions of dollars in exchange for recordkeeping services and trustee services rendered to the Plan. Defendants' conduct was especially egregious given that Prudential/Empower received additional income from certain of the Plan's investment securities, described below.

19.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

20.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count I), failure to monitor fiduciaries (Count II) and violations of ERISA's prohibited transactions (Counts III and IV).

## II.     JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, et seq.

22.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

23.     For example, Sunrise has at least 11 facilities located in Pennsylvania all of which are    located    in    the    Eastern    District    of    Pennsylvania.    *See* https://www.sunriseseniorliving.com/communities/pa.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff, Nikea Byers resides in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.    PARTIES

### Plaintiffs

25.     Plaintiff, Nikea Byers ("Byers"), resides in Philadelphia, Pennsylvania. During her employment, Plaintiff Byers participated in the Plan. Plaintiff Byers invested in the Prudential GIF in the Plan and suffered injury to her Plan account due to the significant underperformance of the Prudential GIF. In addition, Plaintiff Byers also suffered injury to her Plan account by paying excessive recordkeeping costs.

26.     Plaintiff, Gabrielle Winans ("Winans"), resides in Clarkston, Georgia. During her employment, Plaintiff Winans participated in the Plan. Plaintiff Winans invested in the Prudential GIF in the Plan and suffered injury to her Plan account due to the significant underperformance of the Prudential GIF. In addition, Plaintiff Winans also suffered injury to her Plan account by paying excessive recordkeeping costs.

27.     Plaintiff, Kenneth Smith ("Smith"), resides in New Bern, North Carolina. During his employment, Plaintiff Smith participated in the Plan. Plaintiff Smith invested in the Prudential GIF in the Plan and suffered injury to his Plan account due to the significant underperformance of the Prudential GIF. In addition, Plaintiff Smith also suffered injury to his Plan account by paying excessive recordkeeping costs.

28.     Plaintiff, Tanisha Madison ("Madison"), resides in St. Louis, Missouri. During her employment, Plaintiff Madison participated in the Plan. Plaintiff Madison invested in the Prudential GIF in the Plan and suffered injury to her Plan account due to the significant

underperformance of the Prudential GIF. In addition, Plaintiff Madison also suffered injury to her Plan account by paying excessive recordkeeping costs.

29. Plaintiff, Wanda Sinkler ("Sinkler"), resides in Halethorpe, Maryland. During her employment, Plaintiff Sinkler participated in the Plan. Plaintiff Sinkler invested in the Prudential GIF in the Plan and suffered injury to her Plan account due to the significant underperformance of the Prudential GIF. In addition, Plaintiff Sinkler also suffered injury to her Plan account by paying excessive recordkeeping costs.

30. Plaintiffs have standing to bring this action on behalf of the Plan because they participated and invested in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duties as described herein.

31. Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

32. Sunrise Senior Living, LLC is the Plan sponsor and a Plan administrator with a principal place of business at 7902 Westpark Drive, McLean, Virginia. *See* 2024 Form 5500 of the Plan, at 1; *see also* Sunrise Senior Living 401(k) Plan Summary Plan Description ("SPD"), at 19 ("The Plan Sponsor and Plan Administrator is Sunrise Senior Living, LLC.").

33. The Plan is administered by the 401(k) Plan Fiduciary Committee of Sunrise Senior Living, LLC, whose members are appointed by the Company. See Sunrise Senior Living 401(k)

Plan Investment Policy Statement ("IPS"), at 1 ("The Company has appointed the 401(k) Plan Fiduciary Committee of Sunrise Senior Living, LLC (the "Committee") to fulfill the Company's fiduciary duties in regards to Plan investments.").

34.     Sunrise appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

35.     Accordingly, Sunrise during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

36.     For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**<u>Committee Defendants</u>**

37.     As discussed above, Sunrise appointed the 401(k) Plan Fiduciary Committee of Sunrise Senior Living, LLC to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers and that the Plan paid a fair price for recordkeeping and administrative services.

38.     "[T]he Committee is responsible for the control, management and administration of all U.S. employee 401(k) Plans sponsored by the Company." Charter for the 401(k) Plan Fiduciary Committee of Sunrise Senior Living, LLC ("Committee Charter"), at 2.

39. The Committee's responsibilities include, but are not limited to: "… c. Establishing procedures for selecting and monitoring trustees, investment managers/advisors, insurance companies or any other fiduciary with investment responsibilities ("Investment Fiduciaries"), or investment funds or other options made available under a Plan for participant investment ("Investment Funds"); d. Establishing procedures for selecting and monitoring accountants, attorneys, record keepers, consultants and other service providers other than Investment Fiduciaries ("Service Providers"); and e. Ensuring that the preceding activities are adequately documented as appropriate." Committee Charter, at 2-3.

40. The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

41. The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Committee Defendants."

## IV.    CLASS ACTION ALLEGATIONS[6]

42. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[7]

---

[6] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[7] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Sunrise Senior Living 401(k) Plan, at any time between January 23, 2020 through the date of judgment (the "Class Period").

43. The members of the Class are so numerous that joinder of all members is impractical. The 2024 Form 5500 lists 23,402 Plan "participants with account balances as of the end of the plan year." 2024 Form 5500 at 2.

44. Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

45. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A. Whether Defendants are/were fiduciaries of the Plan;

B. Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C. Whether the Company failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D. The proper form of equitable and injunctive relief; and

11

E.     The proper measure of monetary relief.

46.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

47.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

48.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.     THE PLAN

49.     The Plan is a defined contribution plan covering substantially all eligible employees of Sunrise. *See* SPD, at 2. ("You are an 'Eligible Employee' if you are employed by Sunrise Senior Living, LLC or any affiliate who has adopted the Plan. … You will become eligible to make

12

Elective Deferral Contributions on the first day of the calendar month, coincident with or next following the date you attain age 18, provided that you are an Eligible Employee on that date.").

50.     Included in the Plan's available funds was the Guaranteed Income Fund offered by Empower Annuity Insurance Company (formerly known as Prudential Retirement Insurance and Annuity Company) (EAIC). "The trustee maintains the contributions in a general account." Auditors' Report, attached to 2024 Form 5500, at 12.

51.     At the end of 2020, $67,071,232 in Plan assets were invested in the Prudential GIF. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2020 Form 5500 for the Plan, at 13.

52.     At the end of 2024, over $79 million in Plan assets were invested in the Prudential GIF. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2024 Form 5500 for the Plan, at 16.

53.     The chart below demonstrates the amount of Plan assets invested in the Prudential GIF during the Class Period.

| Plan Year | Plan Assets in Prudential GIF |
| --- | --- |
| 2020 | $67,071,232 |
| 2021 | $70,810,204 |
| 2022 | $67,481,217 |
| 2023 | $73,481,276 |
| 2024 | $79,565,166 |

***Contributions***

54.     Eligible employees may elect to make contributions to their Plan accounts. *See* SPD, at 4 ("You may elect to reduce your Compensation (defined below) and make a contribution to the Plan on a pre-tax basis. These pre-tax contributions are known as Elective Deferral

Contributions. You may elect to defer up to 100% of your Plan Compensation on a pre-tax basis but must defer at least 0% of Plan Compensation.").

55.     There is an automatic contribution feature in the Plan. See SPD, at 4 ("After receiving a notice from the Plan Administrator, you will be deemed to have made an Elective Deferral Contribution election in the amount of 2% of your Plan Compensation.").

56.     Sunrise may make matching contributions to participants' accounts. *See* SPD, at 4-5 ("The Employer may, in its sole discretion, make a matching contribution on your behalf if you make a 'Matched Employee Contribution'. A 'Matched Employee Contribution' is any Elective Deferral Contribution or Catch-up Contribution that you may make during the Plan Year. If you make a 'Matched Employee Contribution' and you are employed by the Employer on the last day of the Applicable Period the Employer may contribute to your Employer Matching Contribution Account in an amount and allocation formula as determined by the Employer in its sole discretion.").

57.     Like other companies that sponsor 401(k) plans for their employees, Sunrise enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

58.     Sunrise also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

59.     Given the size of the Plan, Sunrise likely enjoyed significant tax and cost savings from offering a match.

## VI.     THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO ADMINISTER THE PLAN IN A PRUDENT MANNER

### A.     ERISA Fiduciaries Are Held to the Highest Standards Regarding Process and Methodology of Evaluating Investments

60.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

61.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

62.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

63.     The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[8]

---

[8] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain.

64.    Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

65.    A prudent investment professional, and hence a fiduciary, must regularly evaluate a fund's performance history, the portfolio manager's experience and tenure, changes to the fund's investment strategy, changes to the underlying assets in the investment, total assets under management within the fund, fees, and other relevant factors.

66.    With respect to investment returns, diligent investment professionals monitor the performance of their selected investments using appropriate industry-recognized "benchmarks" and prudently managed equivalents.

67.    The measurement of investments against prudently managed alternatives is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

68.    Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

69.    It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S.

16

Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

70.    It may also indicate a lack of adequate care and attention to ignore sound advice provided by investment advisors.

71.    To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement o, Inc.*, 2022 WL 17260510, at * 10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

72.    Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments and fees because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

73.    In fact, in an attempt to discover the details of the Plan's mismanagement, Plaintiffs first wrote to the Plan administrator on August 21, 2025 to request, among other things, "all written instruments" governing or pertaining to the Plan, including "Investment Policy Statements, and amendments, exhibits, or appendices thereto[,]" "Investment Management Contracts, or other instruments under which the Plan was established or operated, and all amendments, exhibits, or appendices thereto," and as well as any committee's meeting minutes. This request was made pursuant to Section 104(b)(4) of ERISA.

17

74.     By letter dated August 29, 2025, the Plan's administrator responded to Plaintiffs' request. No meeting minutes, to the extent they exist, were produced in response to Plaintiffs' request. Nor was the investment management contract for the Prudential GIF provided.

75.     Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

76.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes and methods based upon several factors as described below.

77.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Prudential GIF in the Plan throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs and underperformance.

**B.      Defendants Breached Their Fiduciary Duties by Causing the Plan to Offer the Prudential GIF**

**1.      Overview of GICs**

78.     For defined-contribution retirement plans, stable value investments are intended to provide participants with an option that protects their assets and is shielded from risks of loss, hence why they are called Guaranteed Investment Contracts or GICs.

18

79.     GICs are issued by insurance companies in the form of a fixed annuity contract. Pursuant to the terms of those contracts, the GICs provide for a guaranteed rate of return or "crediting rate" during a specified period.

80.     There are several different types of stable value investments in the retirement plan marketplace. Large plans often offer "synthetic" stable value funds, which are the least risky, because principal is guaranteed by multiple "wrap providers" and the fund owns the assets of the underlying funds.

81.     Separate account products, where the assets of the underlying funds are held in the separate account of an insurance carrier are riskier, because there is only one "wrap" provider. For separate account GICs, the insurer's payment obligations are putatively backed by a separate account, which is less susceptible to claims and liabilities against the insurer. As a result, separate account GICs offer higher crediting rates.

82.     And General account products, such as the Prudential GIF,[9] where the funds are held unrestricted in the general account of the insurance carrier, are the riskiest type of stable value funds, because they are more vulnerable to single entity credit risk and are riskier than separate account GICs. Consequently, general account GICs offer the highest rates.

83.     Because the funds are kept in unrestricted accounts, they are generally subject to claims and liabilities asserted against the insurer. Such funds are subject to single entity credit risk, meaning the insurer is the sole entity responsible for paying such funds. If the insurer fails to pay funds, no other entity will satisfy the loan.

---

[9] *See* Auditors' Report, attached to 2022 Form 5500 for the Plan, at 12 ("The trustee maintains the contributions in a general account.").

19

**2.      Prudential/Empower Pose A Severe Risk Of Becoming Insolvent**

**a.      The Securities and Exchange Commission Has Warned that Ratings from Credit Rating Agencies Are Unreliable**

84.      Because a guaranteed insurance account product – like the Prudential GIF - is backed by the full faith and credit of the insurer, a focus must be placed on the creditworthiness of the insurer.  It used to be the belief that an insurer's financial strength could be determined in part from its ratings from the four major rating agencies. This is no longer the case.

85.      A June 7, 2023 Securities and Exchange statement declared that ratings issued by ratings agencies are not reliable.  It said these agencies shared blame for the 2008 financial crises:

> These entities' ratings were key to the marketing and sales of mortgage-backed securities, relied on by investors to make informed investment decisions — flaws and conflicts of interest notwithstanding. In some instances, Federal regulations required the use of credit ratings. As the 2011 report noted, the markets' — and, at times the federal government's — reliance on credit ratings that turned out to be highly misleading had consequences that reverberated "throughout the financial system." And not in a good way. …The Commission is replacing the references to credit ratings in Rules 101 and 102 of Regulation M with an alternative standard of creditworthiness that relies on credit risk models.

*See* https://www.sec.gov/newsroom/speeches-statements/lizarraga-statement-credit-ratings-060723

86.      The SEC's reference to reliable credit risk models is instructive. It is widely recognized that the two greatest risks faced by for-profit life insurance and annuity ("L&A") carriers are: (1) Higher Risk, Offshore Reinsurance and (2) Higher-Risk, Less-Liquid and Investment Concentrations.  *See generally*, September 13, 2022 Letter Submitted by Thomas D. Gober, Insurance and Reinsurance Fraud Expert, to The Hon. Sherrod C. Brown, Chairman

Committee on Banking, Housing, and Urban Affairs, at p. 57-68 (available at https://www.congress.gov/117/chrg/CHRG-117shrg53607/CHRG-117shrg53607.pdf)[10]

87.     These two higher-risk categories should always be compared against the L&A carrier's surplus, not total assets.  This credit risk model enables the reader (or Plan fiduciary) to better assess the degree to which those higher risks can be a real threat to the long-term viability of the L&A carrier.

### b.    Based on its Insufficient Surplus, Prudential/Empower Was/Is at Severe Risk of Insolvency

88.     Available surplus is the most relevant criteria for measuring insurance company credit worthiness for a number of reasons, the most pertinent of which is that surplus is the only buffer between a viable insurer and an insolvent one. In other words, if an asset must be written down, the total write-down comes out of surplus. That is why it is imprudent to have a thin surplus buffer relative to the carrier's risk profile.

89.     An important surplus adequacy benchmark ratio is the Surplus to Liabilities (S/L) Ratio. The higher the ratio, the better.  The national average for the L&A industry is roughly 7.5%. That average of 7.5% is significantly pulled down by some of the larger, aggressive private equity-controlled carriers with much lower ratios.  During the Class Period, Empower (and before it, Prudential), had an alarmingly low S/L ratio.  For example, as of 2024, Empower's S/L ratio was less than 1%:

---

[10] The letter to The Hon.  Sherrod C. Brown is found within "Current Issues in Insurance, Hearing Before the Committee on Banking, Housing, and Urban Affairs United States Senate, September 8, 2022, available at https://www.govinfo.gov/

ANNUAL STATEMENT FOR THE YEAR 2024 OF THE Empower Annuity Insurance Company

## LIABILITIES, SURPLUS AND OTHER FUNDS

| | | 1 Current Year | 2 Prior Year |
|---|---|---|---|
| 28. | Total liabilities (Lines 26 and 27) | 106,414,669,390 | 91,068,627,605 |
| 29. | Common capital stock | 2,500,000 | 2,500,000 |
| 30. | Preferred capital stock | | |
| 31. | Aggregate write-ins for other-than-special surplus funds | 0 | 0 |
| 32. | Surplus notes | 0 | |
| 33. | Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | 943,498,537 | 943,498,537 |
| 34. | Aggregate write-ins for special surplus funds | 42,704,077 | 15,222,689 |
| 35. | Unassigned funds (surplus) | 29,697,164 | (24,056,237) |
| 36. | Less treasury stock, at cost: | | |
| 36.1 | _____ shares common (value included in Line 29 $ _____ ) | | |
| 36.2 | _____ shares preferred (value included in Line 30 $ _____ ) | | |
| 37. | Surplus (Total Lines 31+32+33+34+35-36) (including $ _____ in Separate Accounts Statement) | 1,015,899,778 | 934,664,989 |
| 38. | Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 1,018,399,778 | 937,164,989 |
| 39. | Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 107,433,069,168 | 92,005,792,594 |

Total Surplus:  $   1,018,399,778  EAIC's 2024 Surplus to Liabilities
Total Liabilities:  $  106,414,669,390  Ratio is Less Than 1%. The
**Surplus to Liabs Ratio:**          **0.96%**          National Average is About **7.5%**.

90.    There are numerous L&A carriers that have substantially higher S/L ratios than Empower.  For example, New York Life, at December 31, 2024, had (see below) $26.43 billion in surplus and $218.5 billion in liabilities. That yields a S/L ratio of 12.1%:

| | | | |
|---|---|---|---|
| 28. | Total liabilities (Lines 26 and 27) | 218,473,153,964 | 206,607,540,338 |
| 29. | Common capital stock | | |
| 30. | Preferred capital stock | | |
| 31. | Aggregate write-ins for other-than-special surplus funds | | |
| 32. | Surplus notes | 4,233,167,821 | 4,232,366,504 |
| 33. | Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | | |
| 34. | Aggregate write-ins for special surplus funds | 803,673,430 | 434,820,194 |
| 35. | Unassigned funds (surplus) | 21,390,599,996 | 20,626,889,733 |
| 36. | Less treasury stock, at cost: | | |
| 36.1 | _____ shares common (value included in Line 29 $ _____ ) | | |
| 36.2 | _____ shares preferred (value included in Line 30 $ _____ ) | | |
| 37. | Surplus (Total Lines 31+32+33+34+35-36) (including $ _____ in Separate Accounts Statement) | 26,427,441,247 | 25,294,076,431 |
| 38. | Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 26,427,441,247 | 25,294,076,431 |
| 39. | Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 244,900,595,211 | 231,901,616,769 |

Total Surplus:  $   26,427,441,247  EAIC's 2024 Surplus to Liabilities
Total Liabilities:  $  218,473,153,964  Ratio is Less Than 1%. The
**Surplus to Liabs Ratio:**          **12.10%**          National Average is About **7.5%**.

**c.        Prudential/Empower Is/Was Rendered Vulnerable Because of its Higher Risk, Offshore Reinsurance Compared to its Surplus**

91.    Specific to this matter, Empower entered into several significant reinsurance transactions with one offshore reinsurer. First, Empower ceded (Schedule S – Part 3 shown below) **$2.64 billion in Reserve Credit** (column 9) to Hannover Life Reassurance Company of America

22

(Bermuda) Ltd (HLRCA Bermuda). The "reserve credit" means that Empower has *deducted* that

$2.64 billion from its liabilities because the reinsurer has reportedly *set up* that amount in liabilities

on their end. As an offshore reinsurer, HLRCA Bermuda does not report to US regulators under

US SAP (Statutory Accounting Principles). This lack of transparency is significant and makes it

difficult, most often impossible, to determine how the reinsurer is accounting for the transaction

on their end.



92.    Separate and in addition to the reserve credit reported above, Empower has also

entered into a Modified Coinsurance (ModCo) reinsurance contract with HLRCA Bermuda. Note

below, in column 14, that ModCo reinsurance balance was **$25.4 billion**:



93.    The total reported balance of **both offshore contracts is $28 billion**. For

perspective, Empower reports total surplus at the same date of **$1.02 billion**:



94.      The end result of the above maneuvering is that Empower made it appear it had many billions less liabilities than it really had by purportedly off-loading its liabilities to a reinsurer.  There is no way to confirm the reinsurer's viability because the reinsurer is off-shore and does not report under statutory accounting in the United States.[11]

95.      Moreover, because HLRCA Bermuda does not report in the US in compliance with US statutes, under US SAP, it can't be determined what the "substance" of the transactions are and if HLRCA Bermuda has properly reserved for them. In fact, most technical industry media and numerous federal agencies have warned that the concern with offshore reinsurance, in addition

---

[11] *See* "Moody's Waves Yellow Flag as Worries Mount About Reinsurance Deals," by Warren S. Hersch, June 5, 2203 (quoting Moody's Investors Service as stating off-shore reinsurer "business provides less transparency for investors and is generally subject to less regulation than business that resides onshore in U.S.-regulated entity"  *See also* "FSOC raises alarm on insurers' use of offshore reinsurance," by Kenneth Araullo, May 10, 2025 (stating "The US Financial Stability Oversight Council (FSOC) has raised concerns about the financial stability of life insurers, citing increasingly complex investment strategies and a growing reliance on offshore reinsurers with less stringent capital requirements."), available at https://www.insurance businessmag.com/reinsurance/news/breaking-news/fsoc-raises-alam-on-insuers-use-of-offshore-reinsurance-527931.aspx.

to the lack of transparency, is that a primary motive for going offshore is "regulatory arbitrage,"[12] meaning that the regulatory regime offshore allows less stringent reserving for liabilities, lower capital requirements and less asset quality restrictions. *See* n. 17.

> **d.     Prudential/Empower Is/Was rendered Vulnerable Because of its Higher Risk, Less-Liquid Investment Concentrations**

96.     Empower has a variety of higher-risk assets in significant concentrations relative to its surplus. At December 31, 2024, Empower reported a total of $4.3 billion in higher-risk, less traditional investments that are *not* reported under Long-Term Bonds. These include $3.75 billion in commercial mortgage loans and $552 million in "Other" invested assets and Derivatives, of which $236.5 million are notably affiliated. Under the Long-Term Bonds category, Empower reports another $3.8 billion in higher-risk, less liquid bond categories, including Residential Mortgage-Backed Securities (MBS), Commercial MBS, "Other Loan-Backed and Structured Securities."

97.     The combined total of the above-described investments is $8.1 billion. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:

---

[12] "Regulatory arbitrage is a practice whereby firms capitalize on loopholes in regulatory systems in order to circumvent unfavorable regulations. Arbitrage opportunities may be accomplished by a variety of tactics, including restructuring transactions, financial engineering and geographic relocation to amenable jurisdictions." Investopedia, found at https://www.investopedia.com/terms/r/regulatory-arbitrage.asp



98.    Again, the inadequate surplus compared to the investment concentrations puts Empower in dire risk of insolvency, especially in light of the widely reported investment liquidity and valuation stresses today.

*** 

99.    In short, Empower/Prudential's lack of adequate surplus compared to its true liabilities during the Class Period has put Empower/Prudential squarely at risk of insolvency thereby making any "guaranteed" investment contract not worth the paper it is written on.

### 3.    The Plan's Inclusion of the Prudential GIF

100.    As indicated above, the Plan was invested in the proprietary guaranteed investment fund managed by Prudential/Empower, the Prudential GIF.

101.    There are two significant problems with the Prudential GIF discussed below. First, the Prudential GIF is a general account GIC. As a general account product, the Prudential GIF thus

has the following characteristics: single-entity credit risk, plan-level illiquidity, lack of Plan participant ownership and investment control over assets, and lack of transparency as to fees.

102. The second related problem with the Prudential GIF is that its crediting rates (*i.e.*, rates of return on investment) were/are well below what Defendants could have obtained for the Plan participants on the open market.

103. Defendants' selection of the imprudent Prudential GIF was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

104. At all relevant times, Defendants maintained the authority to exercise control over the Plan's investments, including the Plan's Prudential GIF.

105. The Auditors' Report attached the 2024 Form 5500 for the Plan states as follows:

> ***The Plan has a benefit-responsive investment contract*** with Empower Annuity Insurance Company (EAIC). EAIC maintains the contributions in a general account. The account is credited with earnings on the underlying investments and charged for participant withdrawals and administrative expenses. ***The investment contract issuer is contractually obligated to repay the principal and a specified interest rate that is guaranteed to the Plan***.

> Interest is credited on contract balances using a single portfolio rate approach. Under this methodology, a single interest rate is applied to all contributions made to the product, regardless of the timing of those contributions. ***Interest crediting rates are reviewed on a semiannual basis for resetting*** but may not be less than 1.50 percent. When establishing interest crediting rates for this product, ***EAIC considers many factors, including current economic and market conditions, the general interest rate environment, and both the expected and actual experience of a reference portfolio within the issuer's general account***.

> ***Generally, there are no events that could limit the ability of the Plan to transact at contract value paid within 90 days or, in rare circumstances, contract value paid over time***. There are no events that allow the issuer to terminate the contract and that require the plan sponsor to settle an amount different than contract value paid either within 90 days or over time.

As described in Note 2, because the contract is fully benefit responsive, contract value is the relevant measurement attribute for that portion of the net assets attributable to the investment contract. Participants may ordinarily direct the withdrawal or transfer of all or a portion of their investments at contract value.

The Plan has an Evergreen Group Annuity Contract with Empower for the Guaranteed Income Fund. The trustee maintains the contributions in a general account. The account has interest credited daily based on interest crediting rates declared by the trustee in advance of the contract's specific guarantee period. ***The trustee guarantees the crediting rate and principal for the guarantee period***. The contract is included in the financial statements at contract value as reported to the Plan by the trustee. Contract value represents deposits made to the contract, plus earnings at guaranteed crediting rates, less participant withdrawals and fees. Participants may ordinarily direct the withdrawal or transfer of all or a portion of their investment at the contract value.

Certain events may limit the ability of the Plan to transact at contract value with the issuer. Such events include the following: (1) material plan amendments (including partial or complete termination of the Plan or merger of the Plan with another plan); (2) the failure of the Plan's trust to qualify for exemption from federal income taxes or any required prohibited exemption under ERISA; (3) changes in the Plan's prohibition on competing investment options; and (4) premature termination of the contract by the Plan. ***The Plan Sponsor does not believe that the occurrence of any such event, which would limit the Plan's ability to transact at contract value with participants, is probable***.

In addition, certain events allow the issuer to terminate the contract with the Plan and settle at an amount different from contract value. These events may be different under each contract. Such events include (1) an uncured violation of the Plan's investment guidelines, (2) a breach of material obligation under the contract, (3) a material misrepresentation, or (4) a material amendment to the agreement without the consent of the issuer.

There are no reserves against contract value for credit risk of the contract issuer or otherwise. The crediting interest rate is based on a formula agreed upon with the issuer, with a minimum rate of 1.5 percent. ***Such interest rates are reviewed on a semi-annual basis for resetting***.

Auditors' Report attached to the 2024 Form 5500 for the Plan, at 13 (emphasis added).

106.    For these reasons, the Prudential GIF's crediting rates can be compared to other traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity

28

contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-responsive,[13] (2) whose rates are reviewed regularly, and (3) whose contracts are with creditworthy insurance carriers. The Prudential GIF's crediting rates can be also compared to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at the contract value like the Prudential GIF, therein making risk considerations equivalent. The Comparator GICs below meet these requirements.

107.    Defendants' selection of the imprudent Prudential GIF was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

### 4.    There are Many GICs in the Marketplace with Competitive Crediting Rates

108.    The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

109.    Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates, and hence lower spreads, were available to the Plan, but were not selected by Defendants.

110.    As a representative example, one of these comparisons include:

- Auto-Owners Life Insurance Company ("AOLIC") provided a "fully benefit-responsive investment contract" for the Auto-Owners Insurance Company Retirement Savings Plan. Auditor's Report, attached to 2023 Form 5500 for the Auto-Owners Insurance Company Retirement Savings Plan, at 9. Further, like the Prudential GIF, "[t]he plan administrator does not believe that the occurrence of and such value event, which would limit the Plan's ability to transact at contract value with participants, is probable." *Id*., at 10. Finally, "[t]he guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date." *Id*.

---

[13] *See* Auditors' Report attached to the 2024 Form 5500 for the Plan, at 11 ("The Guaranteed Income Fund is a fully benefit-responsive investment contract with Empower.")

111. The Prudential GIF in the Plan had chronically underperforming crediting rates when compared against stable value GICs provided by other comparable carriers for other retirement plans.

112. Because of the compounding losses or gains of investments, prudent fiduciaries will compare relative performance of comparable investments, rather than just absolute performance. This is because even a "1%" difference causes exponential losses beyond what occurs "each year" because of the "lost investment opportunity" that a better performing fund "would have earned over time." *Tibble II*, 843 F.3d at 1198.

        **a.**      **The Prudential GIF performed poorly when compared to the Comparator Funds at the Start of the Class Period**

113. In 2020, the GIC offered in the Auto-Owners Insurance Company Retirement Savings Plan performed much better than the Prudential GIF. Specifically, the GIC offered in the Auto-Owners Insurance Company Retirement Savings Plan had a calculated crediting rate of 3.07%. The calculated crediting rate for the Prudential GIF was 1.73% in 2020.

114. The table below demonstrates the underperformance of the Prudential GIF compared to the Comparator Fund.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[14] |
|---|---|---|---|---|---|
| 2020 | Auto-Owners Insurance Company Retirement Savings Plan | 7,192 | $620,678,961 | Auto-Owners Insurance Company | 3.07% |
| | **Sunrise 401(k) Plan** | **22,188** | **$298,880,271** | **Prudential** | **1.73%** |

---

[14] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

115. In 2020, the Prudential GIF underperformed the GIC in the Auto-Owners Insurance Company Retirement Savings Plan by 43.65%.

116. Additionally, the Prudential GIF underperformed other GICs with similar characteristics as the Prudential GIF in 2020, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln Financial Group | 4.16% |
| | Alina 401(k) Retirement Savings Plan | 32,203 | $2,690,046,457 | Brighthouse Life Insurance Company | 3.72% |
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **Sunrise 401(k) Plan** | **22,188** | **$298,880,271** | **Prudential** | **1.73%** |

**b.    The Prudential GIF's Poor Performance Continued through 2021**

117. As demonstrated in the table below, the Prudential GIF's poor performance continued through 2021

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2021 | Auto-Owners Insurance Company Retirement Savings Plan | 7,480 | $711,146,156 | Auto-Owners Insurance Company | 3.02% |

| | Sunrise 401(k) Plan | 22,238 | $330,555,409 | Prudential | 1.62% |
|---|---|---|---|---|---|

118. In 2021, the Prudential GIF underperformed the GIC in the Auto-Owners Insurance Company Retirement Savings Plan by 46.36%.

119. Additionally, the Prudential GIF underperformed other GICs with similar characteristics as the Prudential GIF in 2021, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |
| | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln Financial Group | 4.23% |
| | Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| | **Sunrise 401(k) Plan** | **22,238** | **$330,555,409** | **Prudential** | **1.62%** |

c.    **The Comparator Fund Outperformed the Prudential GIF in 2022**

120. As demonstrated in the table below, the Prudential GIF's poor performance continued through 2022.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2022 | Auto-Owners Insurance Company Retirement Savings Plan | 8,251 | $672,249,956 | Auto-Owners Insurance Company | 3.08% |
| | **Sunrise 401(k) Plan** | **24,414** | **$289,572,523** | **Prudential/Empower** | **1.69%** |

121.    In 2022, the Prudential GIF underperformed the GIC in the Auto-Owners Insurance Company Retirement Savings Plan by 45.13%.

122.    Additionally, the Prudential GIF underperformed other GICs with similar characteristics as the Prudential GIF in 2022, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln Financial Group | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |
| | Alina 401(k) Retirement Savings Plan | 34,554 | $2,678,277,538 | Brighthouse Life Insurance Company | 3.69% |
| | Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |

| | | | | | |
|---|---|---|---|---|---|
| | **Sunrise 401(k) Plan** | **24,414** | **$289,572,523** | **Prudential/Empower** | **1.69%** |

### d. The Prudential GIF's Poor Performance Continued through 2023

123.    As demonstrated in the table below, the Prudential GIF's poor performance continued through 2023.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2023 | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Insurance Company | 3.48% |
| | **Sunrise 401(k) Plan** | **23,258** | **$333,311,609** | **Empower** | **1.84%** |

124.    In 2023, the Prudential GIF underperformed the GIC in the Auto-Owners Insurance Company Retirement Savings Plan by 47.13%.

125.    Additionally, the Prudential GIF underperformed other GICs with similar characteristics as Prudential GIF in 2023, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2023 | Valley Hospital Retirement Defined Contribution Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |

| | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |
| | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| | **Sunrise 401(k) Plan** | **23,258** | **$333,311,609** | **Empower** | **1.84%** |

       e.      **The Comparator Fund Outperformed the Prudential GIF in 2024**

126.    In 2024, the Comparator Fund outperformed the Prudential GIF.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2024 | Auto-Owners Insurance Company Retirement Savings Plan | 8,950 | $864,332,421 | Auto-Owners Insurance Company | 3.40% |
| | **Sunrise 401(k) Plan** | **23,402** | **$360,105,590** | **Empower** | **2.01%** |

127.    In 2024, the Prudential GIF underperformed the GIC in the Auto-Owners Insurance Company Retirement Savings Plan by 40.88%.

128.    Additionally, the Prudential GIF underperformed other GICs with similar characteristics as the Prudential GIF in 2024, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2024 | Lexmark Savings Plan | 2,926 | $1,211,057,397 | American General Life Insurance Company | 3.38% |

| | Martignetti Companies, LLC 401(k) Plan | 1,160 | $240,540,763 | Massachusetts Mutual Life Ins. Co. | 4.35% |
|---|---|---|---|---|---|
| | Northeast Medical Services Profit Sharing 401(k) Plan | 1,467 | $174,979,442 | New York Life Ins. Co. | 4.58% |
| | Boyd Company 401(k) Plan | 1,762 | $204,430,246 | Standard Insurance Company | 3.21% |
| | **Sunrise 401(k) Plan** | **23,402** | **$360,105,590** | **Empower** | **2.01%** |

129. Throughout the Class Period, the Prudential GIF underperformed the GIC in the Auto-Owners Insurance Company Retirement Savings Plan by an average of over 53% as demonstrated in the table below.

| Year | Prudential GIF Rate of Return in the Plan | Comparator Average Rate of Return | Prudential GIF Percentage of Underperformance in the Plan |
|---|---|---|---|
| 2020 | 1.73% | 3.61% | 52.08% |
| 2021 | 1.62% | 3.99% | 59.40% |
| 2022 | 1.69% | 3.92% | 56.89% |
| 2023 | 1.84% | 3.78% | 51.32% |
| 2024 | 2.01% | 3.78% | 46.83% |
| Average Underperformance during Class Period | | | 53.30% |

130. The dramatic disparities between crediting rates in all years demonstrate that any purported difference in GIC type or theoretical risk cannot be the reason for the Prudential GIF's dismal crediting rate.

131. Again, the specific Comparator Fund used herein had similar risk considerations based on its terms and the creditworthiness of its insurance carriers. The Comparator Fund was

36

fully benefit-responsive and its crediting rates were regularly reviewed in the same prevailing marketplace and economic circumstances as the Prudential GIF.

132. In short, because the Plan held about $300 million in assets under management at the start of the Class Period, it had considerable leverage to bargain for higher crediting rates.

133. A prudent fiduciary would have known that other providers of fixed annuities offer substantially identical, better-performing stable value investments. A prudent fiduciary could have accomplished this goal by demanding higher crediting rates and/or by submitting requests for proposals to Prudential/Empower and other providers of stable value investments.

134. By selecting the Prudential GIF with underperforming crediting rates, Defendants failed to provide participants with an option that maximized the value of their investments.

135. With the significant amount of assets under management in the Prudential GIF, the losses suffered by Plan participants were devastating costing the Plan and its participants millions of dollars. Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[15]

## VII.    ERISA'S PROHIBITED TRANSACTIONS PROVISIONS

136. Restrictions under ERISA prohibit fiduciaries from causing the Plan to engage in transactions with themselves or other fiduciaries or parties-in-interest. *See* 29 U.S.C. § 1106(a)-(b). Section 1106(a)(1) states, in pertinent part:

---

[15] Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource center/publications/401k-plan-fees.pdf (accessed Feb. 14, 2025).

A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

(A)    sale or exchange, or leasing, of any property between the plan and a party in interest;

. . .

(C)    furnishing of goods, services, or facilities between the plan and a party in interest;

(D)    transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

137.    Section 1106(b) further provides, in pertinent part:

A fiduciary with respect to the plan shall not –

(1)    deal with the assets of the plan in his own interest or for his own account,

(2)    in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interest of the plan or the interests of its participants or beneficiaries, or

(3)    receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

A.    **Defendants Committed a Prohibited Transaction Resulting in Excess Compensation Paid to Prudential/Empower**

138.    During the Class Period, Defendants allowed Plan assets to be invested in the Prudential GIF that performed poorly when compared to other investments that were available, and knowing that Prudential/Empower, or its affiliates, were/are offering recordkeeping and trustee services to the Plan.

139.    Prudential/Empower was a party in interest[16] to the Plan as was receiving compensation for managing/maintaining the Prudential GIF, as well as indirect compensation from the spread – the difference between the amount Prudential/Empower earned on the investments and the amount Prudential/Empower paid to Plan participants.

140.    As an alternative to investing Plan assets in the Prudential GIF, the Plan could have invested assets in better performing investments with the same investment strategies and goals. Defendants failed to consider this approach because it would have eliminated the compensation earned by Prudential/Empower.

141.    Defendants did not prudently and objectively evaluate the Prudential GIF in the interests of Plan participants, as prudent fiduciaries would do. Rather, Defendants selected the Prudential GIF in order to benefit Prudential/Empower and its/their affiliates.

142.    The Plan's sizeable investment in the Prudential GIF provided Prudential/Empower a substantial amount of compensation at the expense of Plan participants.

**B.    Defendants Committed a Prohibited Transaction Resulting in Excessive Recordkeeping costs for the Plan and its Participants**

143.    During the Class Period, Defendants entered into a contract with Prudential to provide recordkeeping and trustee services to the Plan. However, such an engagement is a prohibited transaction under ERISA.

---

[16] "Certain of the Plan's investments are managed by affiliates of the trustees [Prudential prior to April 1, 2022 and Empower on April 1, 2022 and continuing thereafter], and therefore, these transactions qualify as party-in-interest transactions. Fees incurred by the Plan for the investment manager services are included in net depreciation in the fair value of investments, as they are paid through revenue sharing, rather than a direct payment." Auditors' Report, attached to 2022 Form 5500 for the Plan, at 13; *see also id*., at 7 ("Effective April 1, 2022, Empower acquired the full-service retirement business of Prudential.").

144. 29 U.S.C. §§ 1106(a)(1)(C) provides that "(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect … (C) furnishing of goods, services, or facilities between the plan and a party in interest."

145. Here, Prudential was a party in interest to the Plan as it was receiving compensation for recordkeeping and trustee services, as well as indirect compensation from the Plan in the form of revenue share being paid to Prudential from Prudential funds in the Plan.

### 1. Costs for Recordkeeping Services Vary Little Between Competing Providers for a Plan with a Substantial Number of Participants

146. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as "RKA."

147. There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

> A. Basic account recordkeeping (e.g. demographic, source, investment and vesting records);
>
> B. Multi-channel participant and plan sponsor access (e.g. phone, web);
>
> C. Daily participant transaction accounting (e.g., purchases, redemptions, exchanges);

D.    Payroll service (e.g. hardships, in-service withdrawals, termination distributions);

E.    Participant tax reporting services (e.g., IRS Form 1099-R);

F.    Participant confirmations, statements, and standard notices;

G.    Plan-level reporting and annual financial package (excluding IRS Form 5500);

H.    Participant education (e.g. newsletters, web articles, standard communication materials);

I.    Plan consulting (e.g., preapproved document services, operational materials);

J.    Plan consulting (e.g. preapproved document services, operational compliance support).

148.    This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. As explained in more detail below, the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

149.    The second type of essential recordkeeping services, hereafter referred to as "A La Carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These A La Carte services typically include, but are not limited to, the following:

    a.     Loan processing;

    b.     Brokerage services/account maintenance (if offered by the plan);

    c.     Distribution services; and

    d.     Processing of qualified domestic relations orders.

150.    All national recordkeepers have the capability to provide all of the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan. In fact, several of the services, such as managed account services, self-directed brokerage, Qualified Domestic Relations Order processing, and loan processing are often a profit center for recordkeepers.

151.    The cost of providing recordkeeping services depends in large part on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. *See* 1998 DOL Study,[17] at 4.2.2. ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases."). When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increases, the average cost per participant decreases. ***Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.***[18]

---

[17] https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf ("1998 DOL Study").

[18] "[T]he actual cost of administrative services is more dependent on the number of participants in the plan." There is no "logical or practical correlation between an increase in administrative fees and an increase in plan assets." Hewitt Associates, LLC, *Be a Responsible Fiduciary: Ask the Right Questions About 401(k) Plan Fees*, Oct. 2008; *see also* Mercer Investment Consulting, Inc., *DC*

152.    In general, the level, number and character of participant services provided by the recordkeeper have minimal impact upon the costs of providing recordkeeping. That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large fixed costs. Each additional participant placed on the system causes a minimal incremental/marginal cost to the record keeper *notwithstanding the level, number and character of the services provided to that additional participant.*

153.    At the beginning of the Class Period in 2020, Empower and Prudential were among the top recordkeepers nationally as measured by assets being recordkept:

**2020 TOP PROVIDERS (RECORDKEEPERS)[19]**

**Top 10, by Total 401(k) Assets ($MM)**

| | | |
|---|---|---|
| 1 | Fidelity Investments | $2,037,733 |
| 2 | Empower Retirement | $493,577 |
| 3 | The Vanguard Group | $454,223 |
| 4 | Alight Solutions | $434,737 |
| 5 | Principal Financial Group | $322,976 |
| 6 | Voya Financial | $211,389 |
| 7 | T. Rowe Price | $195,224 |
| 8 | Prudential Financial, Inc. | $180,544 |
| 9 | Bank of America Corporation | $173,412 |
| 10 | Charles Schwab | $162,876 |

154.    The recordkeepers in the top ten are all capable of providing the same quality of service and they must do so to succeed in the very highly competitive 401(k) service provider arena. As noted above, these recordkeepers for large 401(k) plans invest in technology infrastructure necessary to provide recordkeeping and transaction services to all clients (*e.g.,* website, call center, and some print services).

---

*Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance* (2013), https://www.mercer.com/content/dam/mercer/.

[19] *See* https://www.runnymeade.com/blog/401k-providers-2020-top-10-lists/.

155.    Accordingly, a plan sponsor or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

### 2.    The Plan's Recordkeeping Fees were Excessive

156.    Because recordkeeping costs are not affected by account size, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees as a fixed dollar amount rather than as a percentage of assets. *See* Mercer Best Practices at 3. Otherwise, as plan assets grow, the recordkeeping compensation increases without any change in the recordkeeping services, leading to unreasonable fees.

157.    As demonstrated in the table below, the Plan's participants were saddled with above-market administrative and recordkeeping fees since before the start of the Class Period up to at least 2024.

| Plan Year | Participants | Total RKA Reported | $PP |
|---|---|---|---|
| 2018 | 22,649 | $1,129,853 | $49.89 |
| 2019 | 22,204 | $1,193,236 | $53.74 |
| 2020 | 22,188 | $1,344,730 | $60.61 |
| 2021 | 22,238 | $1,621,313 | $72.91 |
| 2022 | 24,414 | $1,536,971 | $62.95 |
| 2023 | 23,258 | $1,605,801 | $69.04 |
| 2024 | 23,402 | $1,625,831 | $69.47 |

158.    The above fees were excessive when benchmarked against similar plans.

159.    At all times during the Class Period a per participant fee in excess of $60 (the lowest per participant fee during the Class Period) was excessive.

160.    Looking at recordkeeping costs for plans similar in size to the combined assets and participant size of the Plan during the Class Period shows that the Plan was paying higher recordkeeping fees than their peers.

| Plan Year | Plan Name | Participants | Assets Under Management | Recordkeeper | Schedule C Codes | Indirect Compensation | Cost Per Participant[20] |
|---|---|---|---|---|---|---|---|
| **2020** | Optumcare Management, LLC 401(k) Retirement Savings Plan | 9,832 | $938,281,291 | Fidelity | 37 60 64 65 71 | Yes - $0 | $19 |
| | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 19,354 | $1,051,387,744 | Vanguard | 15 16 21 25 26 37 50 52 57 | Yes - $0 | $23 |
| | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 7,597 | $493,950,650 | Fidelity | 37 60 64 65 | Yes - $0 | $28 |
| | PG&E Corporation Retirement Savings Plan | 12,273 | $3,781,395,000 | Fidelity | 37 64 65 71 | No | $29 |
| | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 19,354 | $1,051,387,744 | Vanguard | 15 25 50 16 26 52 21 37 57 | Yes - $0 | $23 |
| | Viacom 401(k) Plan | 12,469 | $1,747,213,865 | Great-West | 15 37 50 64 | No | $37 |
| | **Sunrise 401(k) Plan** | **22,188** | **$298,880,271** | **Prudential** | **13 15 37 50 64** | **Yes - $0** | **$61** |
| **2021** | Crowe LLP Retirement Plan | 6,840 | $1,021,351,197 | Vanguard | 15 33 37 99 | Yes - $0 | $27 |
| | Optumcare Management, LLC 401(k) Retirement Savings Plan | 10,170 | $1,341,037,601 | Fidelity | 37 60 64 65 71 | Yes - $0 | $28 |
| | Pacific Architects and Engineers, LLC 401(k) Savings Plan | 14,583 | $693,883,632 | Fidelity | 37 60 64 65 | Yes - $0 | $5 |
| | FedEx Office and Print Services, Inc. 401(k) | 20,072 | $1,218,209,533 | Vanguard | 15 25 52 16 37 57 21 50 26 50 | Yes - $0 | $31 |

---

[20] Unless otherwise noted, these fees are taken from the Form 5500.

|  | | | | | | | |
|---|---|---|---|---|---|---|---|
|  | Retirement Savings Plan | | | | | | |
|  | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 15,788 | $1,706,447,554 | Fidelity | 37, 60, 64, 65, 71 | Yes - $0 | $26 |
|  | Fortive Retirement Savings Plan | 12,758 | $1,987,784,377 | Fidelity | 37, 64, 65, 71 | No | $34 |
|  | PG&E Corporation Retirement Savings Plan | 12,994 | $4,285,161,000 | Fidelity | 37 64 65 71 | No | $33 |
|  | **Sunrise 401(k) Plan** | **22,238** | **$330,555,409** | **Prudential** | **13 15 37 50 64** | **Yes - $0** | **$73** |
| **2022** | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 16,973 | $1,475,238,032 | Fidelity | 37, 60, 64, 65, 71 | Yes - $0 | $29 |
|  | Crowe LLP Retirement Plan | 7,584 | $992,984,046 | Vanguard | 15 33 37 99 | Yes - $0 | $26 |
|  | Optumcare Management, LLC 401(k) Retirement Savings Plan | 11,787 | $1,099,817,927 | Fidelity | 37 60 64 65 71 | Yes - $0 | $30 |
|  | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 20,817 | $1,076,210,385 | Vanguard | 15 25 50 16 33 52 21 37 57 26 50 | Yes - $1,081 | $29 |
|  | Vista Outdoor Inc. 401(k) Plan | 7,295 | $440,444,788 | Vanguard | 15 16 33 37 38 99 | Yes - $0 | $33 |
|  | Expeditors International of Washington, Inc. 401(k) Plan | 9,597 | $839,061,386 | T. Rowe Price | 15 21 25 28 37 38 49 50 52 59 62 64 65 | Yes - $0 | $31 |
|  | **Sunrise 401(k) Plan** | **24,414** | **$289,572,523** | **Prudential** | **13 15 37 50 64** | **Yes - $0** | **$67** |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **2023** | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 18,163 | $1,837,546,518 | Fidelity | 37, 60, 64, 65, 71 | Yes - $0 | $32 |
| | Crowe LLP | 7,992 | $992,984,046 | Vanguard | 15 33 37 99 | Yes - $0 | $26 |
| | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 20,327 | $1,270,937,672 | Vanguard | 15 25 50 16 33 52 21 37 57 26 50 | Yes - $0 | $24 |
| | Fortive Retirement Savings Plan | 13,503 | $1,915,519,824 | Fidelity | 37, 64, 65, 71 | Yes - $0 | $26 |
| | **Sunrise 401(k) Plan** | **23,258** | **$333,311,609** | **Empower** | **13 15 37 50 64** | **Yes - $0** | **$69** |
| **2024** | The Tax Sheltered Annuity Plan of Texas Children's Hospital | 18,510 | $2,141,432,097 | Fidelity | 37, 60, 64, 65, 71 | Yes - $0 | $40 |
| | Crowe LLP | 7,934 | $1,265,316,102 | Vanguard | 15 33 37 99 | Yes - $0 | $21 |
| | FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | 20,115 | $1,421,158,765 | Vanguard | 15 25 50 16 33 52 21 37 57 26 50 | Yes - $0 | $30 |
| | Fortive Retirement Savings Plan | 13,189 | $2,138,117,923 | Fidelity | 37, 64, 65, 71 | Yes - $0 | $29 |
| | **Sunrise 401(k) Plan** | **23,402** | **$360,105,590** | **Empower** | **64** | **Yes - $0** | **$69** |

161.   The above chart demonstrates that for similar plans, regarding assets and participants, the Plan had one of the highest recordkeeping fees throughout the Class Period.

162.   Every comparator plan in the table above had fewer plan participants than the amount of participants in the Plan. However, each of the comparator plans paid less in recordkeeping fees than the Plan. Indeed, the figures in the above chart are just an example of the Plan's excessive RKA fees during the Class Period.

163.    The Plan should have been able to obtain per participant recordkeeping fees of no more than $26 per participant, and likely even less. This fee is consistent with the average recordkeeping fees paid by similar plans in the country as demonstrated in the allegations above.

164.    Further, because Prudential/Empower was a party-in-interest and received income from the funds it maintained in the Plan, the Plan's fiduciaries should have taken these additional sources of income into consideration to reduce the excessive RKA fees paid to Prudential/Empower.

165.    Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

## COUNT I
### Breaches of Fiduciary Duty of Prudence
### (against the Committee)

166.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

167.    At all relevant times, the Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

168.    As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent

48

person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

169. The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan's participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite poor performance in relation to other comparable investments.

170. As a direct and proximate result of the breaches of fiduciary duties alleged herein related to the Prudential GIF, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

171. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

172. The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

## COUNT II
### Failure to Adequately Monitor Other Fiduciaries
### (against the Company)

173. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

49

174. Sunrise (the "Monitoring Defendant") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and was aware that the Committee had critical responsibilities as fiduciaries of the Plan.

175. In light of this authority, the Monitoring Defendant had a duty to monitor the Committee to ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

176. The Monitoring Defendant also had a duty to ensure that the members of the Committee possessed the needed qualifications and experience to carry out their duties; had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Company.

177. The Monitoring Defendant breached its fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions.

178. As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had the Monitoring Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

179. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendant is liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee.

In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## COUNT III
## PROHIBITED TRANSACTION
### (against all Defendants)

180.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

181.    Under ERISA, a plan fiduciary may not "cause the plan to engage in a transaction" if the fiduciary "knows or should know that such transaction constitutes a direct or indirect" (i) exchange of any property between the plan and a party in interest, or (ii) the furnishing of services between the plan and a party in interest. 29 U.S.C. § 1106(a)(1)(C).

182.    Defendants were at all times fiduciaries to the Plan.

183.    ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

184.    Defendants caused the Plan to engage in the annuity transactions with actual or constructive knowledge that the transactions constituted a direct or indirect exchange of property between the Plan and Prudential/Empower.

185.    Defendants also caused the Plan to engage in the annuity transactions with actual or constructive knowledge that the transaction constituted a direct or indirect furnishing of services between Prudential/Empower and the Plan.

186.    When Defendants caused the Plan to engage in the annuity transaction, Prudential/Empower was a party in interest, including because Prudential/Empower, or its affiliate,

51

was a person providing recordkeeping and trustee services to the Plan. 29 U.S.C. § 1002(14). Defendants knew of that fact when they caused the Plan to engage in the annuity transaction.

187.   These transactions occurred each time the Plan paid fees to Prudential/Empower in connection with the Plan's investments in the Prudential GIF and other proprietary options that paid revenue sharing to Prudential/Empower.

188.   Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

### COUNT IV
### Prohibited Transactions
### (Against All Defendants)

189.   Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

190.   ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), provides, in pertinent part, that "a fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; [or] (D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan and a party in interest."

191.   ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

192.   ERISA § 3(9), 29 U.S.C. § 1002(9) defines "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization."

193.   Defendants' decision to agree to pay excessive fees to Prudential as recordkeeper for the Plan amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

194.   Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.   A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.   Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.   A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.   An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's

assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.       Such other and further relief as the Court deems equitable and just.

Dated: January 23, 2026                 Respectfully submitted,

**CAPOZZI ADLER, P.C.**

*/s/ Mark K. Gyandoh*
Mark K. Gyandoh, Esquire
James A. Maro, Esquire
312 Old Lancaster Road
Merion Station, PA 19066
Email: markg@capozziadler.com
        jamesm@capozziadler.com
Tel.: (610) 890-0200

*Counsel for Plaintiffs and the Putative Class*

55